[No. S071728. Aug. 21, 2000.]

CITY OF BARSTOW et al., Plaintiffs and Respondents, v.
MOJAVE WATER AGENCY et al., Defendants, Cross-complainants and Respondents;
JESS RANCH WATER COMPANY, Cross-defendant and Appellant.

MOJAVE WATER AGENCY et al., Cross-complainants and Respondents, v.
MANUEL CARDOZO et al., Cross-defendants and Appellants.

**COUNSEL**

Covington & Crowe, Robert E. Dougherty and Eric S. Vail for Cross-defendants and Appellants Manuel Cardozo et al.

Kronick, Moskovitz, Tiedemann & Girard, Thomas W. Birmingham, Janet K. Goldsmith and Jon D. Rubin for Westlands Water District as Amicus Curiae on behalf of Cross-defendants and Appellants Manuel Cardozo et al.

Downey, Brand, Seymour & Rohwer, Kevin M. O'Brien, Steven P. Saxton, David R. E. Aladjem and Gwyn-Mohr P. Tully for Northern California Water Association as Amicus Curiae on behalf of Cross-defendants and Appellants Manuel Cardozo et al.

M. David Stirling, Robin L. Rivett and David E. Haddock for Pacific Legal Foundation as Amicus Curiae on behalf of Cross-defendants and Appellants Manuel Cardozo et al.

De Cuir & Somach, Stuart L. Somach and Elizabeth W. Johnson for Cities of Fairfield, Vacaville and Vallejo as Amici Curiae on behalf of Cross-defendants and Appellants Manuel Cardozo et al.

Lemieux & O'Neill and Wayne K. Lemieux as Amici Curiae on behalf of Cross-defendants and Appellants Manuel Cardozo et al.

Gutierrez & Preciado, Gutierrez, Preciado & House, Calvin House and Clifton A. Baker for Cross-defendant and Appellant Jess Ranch Water Company.

Gary A. Ledford as Amicus Curiae on behalf of Cross-defendants and Appellants Manuel Cardozo .et al. and Jess Ranch Water Company.

McCormick, Kidman & Behrens, Arthur G. Kidman, David D. Boyer and Bradley D. Pierce for Plaintiffs and Respondents City of Barstow and Southern California Water Company.

Hatch and Parent, Scott S. Slater, Robert J. Saperstein, Stephanie C. Osler and Kristen T. Derscheid for California Water Association as Amicus Curiae

on behalf of Plaintiffs and Respondents City of Barstow and Southern California Water Company.

Brunick, Alvarez & Battersby, William J. Brunick, Amy Greyson, Jeffery L. Caulfield and Mark C. Potter for Defendant, Cross-complainant and Respondent and for Cross-complainant and Respondent Mojave Water Agency.

Daniel E. Lungren, Attorney General, Charles W. Getz IV, Assistant Attorney General, and Marilyn H. Levin, Deputy Attorney General for Defendant, Cross-complainant and Respondent and for Cross-complainant and Respondent California Department of Fish and Game.

Alan K. Marks, County Counsel, Thomas L. Krahelski and Paul M. St. John, Deputy County Counsel, for Defendants, Cross-complainants and Respondents and for Cross-complainants and Respondents Baldy Mesa Water District, Juniper Riviera County Water District, San Bernardino County Daggett Airport and San Bernardino County Service Areas 29, 42, 64, 70C, 70G, 70J and 70L.

Boyd, Hill, Nossaman, Guthner, Knox & Elliott, Nossaman, Guthner, Knox & Elliott, Frederic A. Fudacz and John Ossiff for Defendant, Cross-complainant and Respondent and for Cross-complainant and Respondent Apple Valley Ranchos Water Company.

Monteleone & McCrory and Thomas P. McGuire for Defendants, Cross-complainants and Respondents and for Cross-complainants and Respondents Victor Valley Water District and City of Victorville.

Best, Best & Krieger, Eric L. Garner and Arthur L. Littleworth for Defendant, Cross-complainant and Respondent and for Cross-complainant and Respondent Rancho Las Flores Limited Partnership.

Therese Exline Parker for Defendants, Cross-complainants and Respondents and for Cross-complainants and Respondents Alfredo Arguelles, Richard F. Barak, Charles Bell, Lillian Borgogno, John Thomas Carter, Marshall Chuang, George Ronald Dahlquist, Alan DeJong, Frank T. Duran, Trinidad L. Gaeta, Wayne D. Gesiriech, S. Harold Gold, Ciril Gomez Living Trust, Daniel C. Gray, Karen Gray, Nick Grill, Merlin Gulbranson Excavating, Scott Hert, Melvin Hill, John Hosking, Jean Hosking, Larry Johnson, Hoon Ho Kim, H. Leslie Levin, J. Peter Lounsbury, Ken Luth, The 160 Newberry Ranch Limited Partnership, Meadowbrook Dairy, Newberry Ranch, George Parker, Ruth Parker, Trinidad Perez, Daniel Pettigrew, Howard Pettigrew,

John S. Pettis, Joan C. Randolph, Bill Resseque, Charles Short, Robert A. Smith, Wayne A. Soppeland, Stanley Stewart, Patricia Stewart, Edward W. Stringer, Thomas Taylor, Carole Taylor, Dale Thomas, Ronald Thomas, James A. Thompson, Cornelius Van Diest, Van Leuwen Family Trust, Albert H. Vogler, Ykema Trust, Ykema Harmsen Dairy, Keith Young and Margie Young.

Redwine and Sherrill and Steven B. Abbott for Defendants, Cross-complainants and Respondents and for Cross-complainants and Respondents Lake Arrowhead Community Services District, Southdown, Inc., and Jean D. DeBlasis as Trustee of the Kemper Campbell Ranch Trust.

Gresham, Savage, Nolan & Tilden and Michael Duane Davis for Defendants, Cross-complainants and Respondents and for Cross-complainants and Respondents Baldy Mesa Water District, Silver Lakes Association and Mitsubishi Cement Corporation.

Markman, Arczynski, Hanson, Curley & Slough, Richards, Watson & Gershon, James L. Markman and Boyd L. Hill for Defendant, Cross-complainant and Respondent and for Cross-complainant and Respondent Hesperia Water District.

Nino J. Mascolo and Douglas P. Ditonto for Defendant, Cross-complainant and Respondent and for Cross-complainant and Respondent Southern California Edison Company.

Morrison & Foerster, Kevin T. Haroff and Kimberly McMorrow for Santa Clara Valley Water District as Amicus Curiae on behalf of Defendants, Cross-complainants and Respondents and Cross-complainants and Respondents Mojave Water Agency et al.

Horton, Knox, Carter & Foote, John Penn Carter and Paul D. Engstrand for Imperial Irrigation District as Amicus Curiae.

Nancy N. McDonough and David J. Guy for California Farm Bureau Federation as Amicus Curiae.

Boyd, Hill, Nossaman, Guthner, Knox & Elliott, Nossaman, Guthner, Knox & Elliott, Frederic A. Fudacz and John Ossiff for Main San Gabriel Basin Watermaster and Raymond Basin Management Board as Amici Curiae.

Louise Renne, City Attorney (San Francisco), Vicki Clayton and Donn W. Furman, Deputy City Attorneys; Ellison & Schneider, Anne J. Schneider and Barbara A. Brenner for City and County of San Francisco as Amicus Curiae.

O'Laughlin & Paris and Tim O'Laughlin for San Joaquin Tributaries Association as Amicus Curiae.

Minasian, Spruance, Baber, Meith, Soares & Sexton for San Joaquin River Exchange Contractors Water Authority as Amicus Curiae.

OPINION

CHIN, J.—

## I. INTRODUCTION

We granted review to determine whether a trial court may definitively resolve water right priorities in an overdrafted basin with a "physical solution" that relies on the equitable apportionment doctrine but does not consider the affected owners' legal water rights in the basin.[1] We conclude it may not, and affirm the Court of Appeal judgment in that respect. In the second part of this opinion, we address whether the Court of Appeal erred in concluding that the trial court abused its discretion when it determined that a water producer who desired to stipulate to the physical solution was fairly apportioned its share of water. We conclude the Court of Appeal erred on this point. We therefore affirm in part and reverse in part the Court of Appeal judgment.[2]

## II. BACKGROUND

The Mojave River originates in the San Bernardino Mountains, where rain and snow runoff give rise to the West Fork of the Mojave River and Deep Creek. These tributaries join at the mountain foothills in an area called The Forks to form the Mojave River. From The Forks, the Mojave River flows approximately 90 miles north to Victorville and Helendale, northeast to Barstow, east to Afton, and finally to its terminus in Soda Lake.

The Mojave River Basin area extends approximately 3,600 square miles and encompasses several cities, including Victorville, Hesperia, Apple Valley, Adelanto, and Barstow.[3] The Mojave River Basin is divided into five hydrologic subareas: The Helendale Fault separates the Alto and Centro

---

[1]The trial court used the phrase "physical solution" to refer to its equitable distribution of water use in relation to the many parties who stipulated to it.

[2]Our decision in no way limits the administrative authority of the State Water Resources Control Board, nor does it affect the state board's authority over surface waters.

[3]A basin is defined as "[t]he tract of country drained by a river and its tributaries." (1 Oxford English Dict. (2d ed. 1989) p. 985, col. 1.)

Basin subareas; the Waterman Fault separates the Centro and Baja Basin subareas; the Oeste Basin subarea is west of the Alto Basin subarea; and the Este Basin subarea is east of the Alto Basin subarea and south of the Centro Basin subarea. Because these basins are interconnected, some of the surface inflow to one basin is outflow from another. The groundwater and surface water within the entire Mojave River Basin constitute a single interrelated source.

The Mojave River, cyclically replenished from rainfall in the San Bernardino Mountains, is the main water source for the Mojave River Basin. The river's flow in the downstream area, however, has decreased in recent years. Groundwater extractions in the Alto Basin have lowered the water table, increasing the Alto Basin's storm flow absorption. As more water is absorbed in the Alto Basin, less water reaches the downstream area.

Before the 1950's, the Mojave River Basin economy primarily relied on transportation, mining, military, and agriculture. The economy and investment in the area soon grew and, by the mid-1950's, demand for water in the basin exceeded the natural supply, resulting in an overdraft condition. Development continued, particularly during the 1970's and 1980's. By 1990, the basin's population was approximately 235,000, more than 10 times the population in 1950. The largest increase in overdraft in the basin occurred between 1970 and 1980. During that time, well levels and water quality experienced a steady and significant decline. If overdraft conditions continue, the basin's water supply will experience significant depletion.

## III. Facts and Procedure

In 1990, the City of Barstow and the Southern California Water Company (plaintiffs) filed this action against the City of Adelanto, the Mojave Water Agency (MWA),[4] and other upstream water producers, claiming that their groundwater production was adversely impacting plaintiffs' water supply, and that they contributed to the entire Mojave River Basin overdraft.[5] Plaintiffs sought an average annual flow of 30,000 acre-feet of water to the Barstow area and a writ of mandate to compel the MWA to import supplemental water from the State Water Project.

---

[4]The MWA has statutory authority to maintain a sufficient water supply. "The agency may do any and every act necessary to be done so that sufficient water may be available for any present or future beneficial use or uses of the lands or inhabitants of the agency, including, without limiting the generality of the foregoing, irrigation, domestic, fire protection, municipal, commercial, industrial, and recreational uses." (Stats. 1959, ch. 2146, § 15, p. 5134; 72A West's Ann. Wat.—Appen. (1999 ed.) § 97-15, subd. (a), p. 208.)

[5]The term "water producers" is interchangeable with the term "water users," and refers to entities that use water for any purpose, including, but not limited to, agricultural, aquacultural, domestic, recreational, industrial, and commercial uses.

In 1991, the MWA served over 1,000 persons with an amended cross-complaint that joined substantially all water producers within the Mojave River Basin, except for certain small producers. The cross-complaint requested a declaration that the available native water supply was inadequate to meet producer demands within the Mojave River Basin and asked the court to apportion water rights among the various water producers.

The trial court stayed the litigation while a committee, composed of attorneys and engineers representing numerous water producers throughout the Mojave River Basin, met to negotiate settlement terms and to develop a physical solution to the water shortage problem. After negotiating for two years, the committee submitted a draft physical solution to the trial court.

The physical solution's stated purposes are (1) to ensure that downstream producers are not adversely affected by upstream use, (2) to raise money to purchase supplemental water for the area, and (3) to encourage local water conservation.

Regionally, the physical solution requires each subarea within the basin to provide a specific quantity of water to the adjoining downstream subarea. The solution places no limits on the amount of water a party can withdraw. Instead, each party is allotted a certain quantity of water—a "free production allowance" based on its prior use—which it can use at no cost. When a party uses water in excess of its free production allowance, it is charged a fee to purchase "replacement" water for that subarea.

The physical solution also sets a "base annual production" amount for each party, determined by the producer's maximum annual production for the five-year period from 1986 to 1990. The solution defines a producer's base annual production right as "the relative right of each producer to the free production allowance within a given subarea, as a percentage of the aggregate of all producers' base annual production in the subarea." The higher the base annual production right, the more water a producer can sell under transfer provisions and produce free of a replacement assessment.

Significantly, the physical solution did not apportion production rights on the basis of preexisting legal water rights. The drafters of the physical solution believed such apportionment would lead to inequitable water allocation. In fact, the trial court expressly held that the parties were "estopped and barred from asserting special priorities or preferences." The court further concluded that allocating water based on asserted legal priorities would be "extremely difficult, if not impossible."

The trial court ordered all parties either to stipulate to the physical solution, file an answer to the cross-complaint, or suffer default. Over 200

parties stipulated to the physical solution. Minimal producers within the Mojave River Basin—those that produced 10 acre-feet of water or less annually—were exempt from the physical solution's terms, and instead were subject to administration under the MWA. The trial court entered an interlocutory judgment imposing the physical solution on the stipulating parties. It then held a trial to adjudicate the individual rights of the nonstipulating parties, including the City of Adelanto, the Cardozo appellants, who were generally described as alfalfa and dairy farmers with legal water rights, and appellants Jess Ranch Water Company (Jess Ranch), property owners that raised trout and engaged in some agricultural pursuits. In contrast to the Cardozo appellants, Jess Ranch wanted to participate in the physical solution and interlocutory judgment. Jess Ranch challenged only the judgment's allocation of acre-feet of water to it, not the physical solution's legality.

The trial court identified the following issues for determination during the nonstipulating parties' trial: (1) characterization of water rights; (2) priority, if any; (3) uses of the water; (4) whether those uses were reasonable; and (5) the amount of reasonable and beneficial use. Other trial issues included identification of the subareas, whether the physical solution created an equitable apportionment of water, and whether it satisfied the requirements of article X, section 2 of the California Constitution, which mandates that water be put to reasonable and beneficial use.[6]

Trial was lengthy, with numerous witnesses testifying. The stipulating parties presented evidence of the Mojave River Basin's hydrogeology and established that the overdraft existed. The stipulating parties also presented

---

[6]Article X, section 2 of the California Constitution was originally adopted in 1928 as former article XIV, section 3. As adopted in 1976, it states, "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to [sic], but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which the owner's land is riparian under reasonable methods of diversion and use, or as depriving any appropriator of water to which the appropriator is lawfully entitled. This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained." (Cal. Const., art. X, § 2.)

evidence regarding the Mojave River Basin's economic development during the overdraft period.

The Cardozo appellants demonstrated they owned land in the basin and that they had been pumping water from wells on that land. Although the Cardozo appellants initially claimed that they held riparian water rights, they did not produce evidence in their properties' chain of title to support that claim. ██ ██ Therefore, they relied on their overlying rights based on the groundwater underneath their property.[7]

In its statement of decision, the trial court recited the case's procedural history and the facts in detail. The court concluded that the constitutional mandate of reasonable and beneficial use dictates an equitable apportionment of all water rights when a river basin is in overdraft. The court found it unnecessary to adjudicate individual legal water rights and instead concluded that the proposed physical solution, incorporating a free production allowance without regard to overlying and riparian water rights holders, would be fair and equitable to nonstipulating farmers and would best satisfy the use policy set forth in Water Code section 106 (domestic use has the highest priority, followed by irrigation).

Several factors influenced the trial court's decision to enforce the physical solution. For example, the court noted the overdraft had existed for several years, the parties disputed the asserted water rights priorities, and a mechanical allocation of legal water rights could lead to an inequitable apportionment and impose undue hardship on many parties. For these reasons and more, the trial court enjoined all parties from asserting special priorities or preferences.

The trial court concluded that in the face of severe overdraft of an interrelated water source, all use was unreasonable, whether or not a user held riparian or overlying rights. The court reasoned that several factors

---

[7]Riparian rights are special rights to make use of water in a waterway adjoining the owner's property. Overlying rights are special rights to use groundwater under the owner's property. (*California Water Service Co. v. Edward Sidebotham & Son* (1964) 224 Cal.App.2d 715, 725 [37 Cal.Rptr. 1] (*California Water Service Co.*).) Both riparian and overlying water rights are usufructuary only, and while conferring the legal right to use the water that is superior to all other users, confer no right of private ownership in public waters. (See *People v. Shirokow* (1980) 26 Cal.3d 301, 307 [162 Cal.Rptr. 30, 605 P.2d 859] (*Shirokow*).) The state's interest in the public groundwater and surface waters is to make water policy that preserves and regulates it. The state does not have the right to possess and use the water to the exclusion of others and has only such riparian, overlying, or appropriative rights as it may obtain by law; its interest is therefore not an ownership interest, but rather a nonproprietary, regulatory one. (See *State of California v. Superior Court* (2000) 78 Cal.App.4th 1019, 1027 [93 Cal.Rptr.2d 276]; *Shirokow, supra,* 26 Cal.3d at p. 309.)

justified the water right allotment on a nonpriority basis, including the climate, the impact of overdraft on interrelated surface and groundwater basins, and the importance of protecting the economy. The court concluded that the doctrine of reasonable and beneficial use, as established by article X, section 2 of the California Constitution, required an equitable apportionment of all rights when a basin is in overdraft. The City of Adelanto stipulated to the judgment following trial.

The Cardozo appellants[8] appealed the trial court judgment. They argued that the physical solution was invalid because it failed to recognize their preexisting and paramount legal water rights under California water law and therefore amounted to a taking without due process. Specifically, they attacked the physical solution on grounds that: "(1) it fails to recognize and protect their water rights; (2) it imposes a burdensome expense on them, with the intention to reduce or eliminate agricultural uses; (3) it encourages waste of water; (4) it encourages unlawful transfer of water; (5) it fails to bind all producers in the basin; (6) it has other harmful and inequitable effects."

The City of Barstow, the MWA, and other parties to the stipulation responded that the Cardozo appellants had failed to prove they had any water rights that the judgment adversely affected. They further argued that any water rights the Cardozo appellants did possess were limited by the principle of reasonable and beneficial use under article X, section 2 of the California Constitution, which, they argued, required the court to apportion water equitably among users in the overdrafted area. They also asserted that the trial court had properly considered the relevant factors before imposing a physical solution.

The Court of Appeal disagreed with these arguments and reversed the trial court judgment against the Cardozo appellants, directing the trial court to enter its order excluding them from its judgment and granting them injunctive relief to protect their water rights. The court concluded that the trial court erred in failing to consider the farmers' potential riparian or overlying water rights when adjudicating water allocation in the overdrafted basin. The court held that it was not required to reverse the entire judgment or in any way to disturb the physical solution as to the stipulating parties, despite the trial court's error. As the Court of Appeal correctly observed, "We see no reason why the parties cannot stipulate to a judgment incorporating the physical solution, nor do we see any reason why a stipulated [solution]

_____

[8]Manuel and Maria Cardozo, Niel DeVries, Virgil Gorman, Richard and Geneva Leyerly, Jerry Osterkamp, David and Elizabeth Daily, Richard and Elaine Fitzwater, Cornelis J. Groen, Robert T. and Barbara T. Older, and Steve Older.

entered into by a large number of water producers in the Mojave Basin should be totally reversed when the rights of the Cardozo Appellants can be fully protected by appropriate trial court orders on remand. [Citations.] . . . [¶] Thus, we protect the rights of the Cardozo Appellants while also respecting the rights of the stipulating parties to agree to a [solution that] waives or alters their water rights in a manner which they believe to be in their best interest." (Fn. omitted.)

The Jess Ranch matter presents different issues. At trial, Jess Ranch introduced evidence to show it pumped over 18,000 acre-feet of water per year from 1986-1990 to support its trout-raising operation and ancillary agricultural properties. The stipulating parties contested the amount of water Jess Ranch put to beneficial use. The trial court found that Jess Ranch failed to establish that its substantial use of water was reasonable and beneficial. The court therefore calculated Jess Ranch's base annual production at a lesser quantity. The court concluded that for purposes of Jess Ranch's joining the stipulated physical solution, it would calculate the amount used annually at 7,480 acre-feet, an amount Jess Ranch challenged.

On appeal, Jess Ranch argued that its water allocation should be increased, because its annual production rights were not calculated on the same basis as those of other producers. The Court of Appeal agreed and reversed the judgment as it applied to Jess Ranch. The court found that Jess Ranch was not given a base annual production amount based on its actual production. The court further stated that the doctrine of reasonable and beneficial use did not justify treating Jess Ranch differently from other producers.

We granted petitions for review filed by the City of Barstow, the Southern California Water Company, the MWA, and other participants in the physical solution and judgment (collectively respondents).[9] The principal question we address is whether the trial court could disregard legal water rights in order

[9]Other defendants and/or cross-defendants to this action are the City of Hesperia and Hesperia Water District, Apple Valley Ranchos Water Company, Victor Valley Water District, Rancho Las Flores Limited Partnership, Baldy Mesa Water District, City of Victorville, Lake Arrowhead Community Services District, Jean C. DeBlasis as trustee of the Kemper Campbell Ranch Trust, Southdown, Inc., Mitsubishi Cement Corporation, Silver Lakes Association, Alfredo Arguelles, Richard F. Barak, Charles Bell, Lillian Borgogno, John Thomas Carter, Marshall Chuang, George Ronald Dahlquist, Alan DeJong, Frank T. Duran, Trinidad L. Gaeta, Wayne D. Gesiriech, S. Harold Gold, Ciril Gomez Living Trust, Daniel C. Gray, Karen Gray, Nick Grill, Merlin Gulbranson Excavating, Scott Hert, Melvin Hill, John Hosking, Jean Hosking, Larry Johnson, Hoon Ho Kim, H. Leslie Levin, J. Peter Lounsbury, Ken Luth, The 160 Newberry Ranch Limited Partnership, Meadowbrook Dairy, Newberry Ranch, George Parker, Ruth Parker, Trinidad Perez, Daniel Pettigrew, Howard Pettigrew, John S. Pettis, Joan C. Randolph, Bill Resseque, Charles Short, Robert A. Smith,

to apportion on an equitable basis water rights to all producers in an overdrafted groundwater basin. We also address respondents' contention that the Court of Appeal erred in concluding the trial court treated Jess Ranch inequitably in its water allocation under the proposed solution and judgment.

## IV. DISCUSSION

### A. *Principles and Policies of California Water Law*

#### 1. *Water Rights*

Courts typically classify water rights in an underground basin as overlying, appropriative, or prescriptive. (*California Water Service Co., supra,* 224 Cal.App.2d at p. 725.)[10] An overlying right, "analogous to that of the riparian owner in a surface stream, is the owner's right to take water from the ground underneath for use on his land within the basin or watershed; it is based on the ownership of the land and is appurtenant thereto." (*California Water Service Co., supra,* 224 Cal.App.2d at p. 725.) One with overlying rights has rights superior to that of other persons who lack legal priority, but is nonetheless restricted to a reasonable beneficial use. Thus, after first considering this priority, courts may limit it to present and prospective reasonable beneficial uses, consonant with article X, section 2 of the California Constitution. (*Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1268 [54 Cal.Rptr.2d 340].)

Wayne A. Soppeland, Stanley Stewart, Patricia Stewart, Edward W. Stringer, Thomas Taylor, Carole Taylor, Dale Thomas, Ronald Thomas, James A. Thompson, Cornelius Van Diest, Van Leuwen Family Trust, Albert H. Vogler, Ykema Trust, Ykema Harmsen Dairy, Keith Young, and Margie Young.

A number of amicus curiae briefs have been filed with this court. The California Water Association filed in support of the City of Barstow; the Santa Clara Valley Water District filed in support of the MWA; Gary A. Ledford filed in support of Jess Ranch and the Cardozo appellants; the Pacific Legal Foundation, the Northern California Water Association, the Cities of Fairfield, Vacaville, and Vallejo, the City and County of San Francisco, the San Joaquin Tributaries Association, the San Joaquin River Exchange Contractors Water Authority, and the Westlands Water District filed in support of the Cardozo appellants. Additionally, the Main San Gabriel Basin Watermaster and the Raymond Basin Management Board filed an amicus curiae brief asking this court to reverse the Court of Appeal decision, and the California Farm Bureau Federation et al. (the Western Growers Association, the Agricultural Council of California, the California Cattlemen's Association, the Nisei Farmers League, the California Association of Winegrape Growers, the Grower-Shipper Vegetable Association, and the Rice Producers of California) and the Imperial Irrigation District filed in favor of affirming the Court of Appeal decision. Wayne K. Lemieux also filed an amicus curiae brief.

[10]For an extensive discussion of California's water law, from its adoption of the English common law riparian rights doctrine to the reasonable use limitation, see Attwater and Markle, *Overview of California Water Rights and Water Quality Law* (1988) 19 Pacific L.J. 957, and Shaw, *The Development of the Law of Waters in the West* (1922) 10 Cal. L.Rev. 443.

■ In contrast to owners' legal priorities, we observe that "[t]he right of an appropriator . . . depends upon the actual taking of water. Where the taking is wrongful, it may ripen into a prescriptive right. Any person having a legal right to surface or ground water may take only such amount as he reasonably needs for beneficial purposes . . . . Any water not needed for the reasonable beneficial use of those having prior rights is excess or surplus water and may rightly be appropriated on privately owned land for non-overlying use, such as devotion to public use or exportation beyond the basin or watershed [citation]. When there is a surplus, the holder of prior rights may not enjoin its appropriation [citation]. Proper overlying use, however, is paramount and the rights of an appropriator, being limited to the amount of the surplus [citation], must yield to that of the overlying owner in the event of a shortage, unless the appropriator has gained prescriptive rights through the [adverse, open and hostile] taking of nonsurplus waters. As between overlying owners, the rights, like those of riparians, are correlative; [i.e.,] each may use only his reasonable share when water is insufficient to meet the needs of all [citation]. As between appropriators, however, the one first in time is the first in right, and a prior appropriator is entitled to all the water he needs, up to the amount he has taken in the past, before a subsequent appropriator may take any [citation].

■ "Prescriptive rights are not acquired by the taking of surplus or excess water. [But] [a]n appropriative taking of water which is not surplus is wrongful and may ripen into a prescriptive right where the use is actual, open and notorious, hostile and adverse to the original owner, continuous and uninterrupted for the statutory period of five years, and under claim of right." (*California Water Service Co., supra*, 224 Cal.App.2d at pp. 725-726.)

Even these acquired rights, however, may be interrupted without resort to the legal process if the owners engage in self-help and retain their rights by continuing to pump nonsurplus waters. (See *Hi-Desert County Water Dist. v. Blue Skies Country Club, Inc.* (1994) 23 Cal.App.4th 1723, 1731 [28 Cal.Rptr.2d 909] (*Hi-Desert County Water Dist.*).) In the present action it is important to note that no parties have claimed prescriptive rights, and the parties that stipulated to the physical solution did not seek findings under the prescriptive rights doctrine.

### 2. 1928 *Constitutional Amendment*

■ Article X, section 2 was added to the California Constitution in 1928 as former article XIV, section 3. The provision limits water rights to reasonable and beneficial uses. (Cal. Const., art. X, § 2.) "[T]he rule of reasonable use as enjoined by . . . the Constitution applies to all water rights enjoyed or asserted in this state, whether the same be grounded on the

riparian right or the right, analogous to the riparian right, of the overlying land owner, or the percolating water right, or the appropriative right." (*Peabody v. City of Vallejo* (1935) 2 Cal.2d 351, 383 [40 P.2d 486] (*Peabody*).) "Under this new doctrine, it is clear that when a riparian or overlying owner brings an action against an appropriator, it is no longer sufficient to find that the plaintiffs in such action are riparian or overlying owners, and, on the basis of such finding, issue the injunction. It is now necessary for the trial court to determine whether such owners, considering all the needs of those in the particular water field, are putting the waters to any reasonable beneficial uses, giving consideration to all factors involved, including reasonable methods of use and reasonable methods of diversion. From a consideration of such uses, the trial court must then determine whether there is a surplus in the water field subject to appropriation." (*Tulare Dist. v. Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 524-525 [45 P.2d 972] (*Tulare*).) We have reiterated these principles in subsequent cases, observing that although "what is a reasonable use of water depends on the circumstances of each case, such an inquiry cannot be resolved *in vacuo* isolated from statewide considerations of transcendent importance. Paramount among these we see the ever increasing need for the conservation of water in this state, an inescapable reality of life quite apart from its express recognition in the 1928 amendment." (*Joslin v. Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 140 [60 Cal.Rptr. 377, 429 P.2d 889], fn. omitted.)

The constitutional amendment therefore dictates the basic principles defining water rights: that no one can have a protectible interest in the unreasonable use of water, and that holders of water rights must use water reasonably and beneficially. Crucial to our own determination here is the fact that the amendment carefully preserves riparian and overlying rights, while abolishing "that aspect of the common law doctrine which entitled a riparian, as against an upstream appropriator, to enforce his right to the entire natural flow of a stream even if his use of the water was wasteful or unreasonable." (*Pleasant Valley Canal Co. v. Borror* (1998) 61 Cal.App.4th 742, 754 [72 Cal.Rptr.2d 1] (*Pleasant Valley*); see also *Gin S. Chow v. City of Santa Barbara* (1933) 217 Cal. 673, 699-700 [22 P.2d 5].)

B. *Equitable Apportionment*

1. *Past Cases*

In previous cases resolving regional water uses, courts allocated water according to preexisting legal rights and relationships. For example, in *Fleming v. Bennett* (1941) 18 Cal.2d 518, 520 [116 P.2d 442], over 200 parties asserted rights to the Susan River's waters. The trial court referred

the matter to the State Water Commission, which prepared a comprehensive report with individual findings regarding 259 claimed rights of users affecting the watershed. (*Id.* at pp. 525, 527.) We affirmed the trial court's decree, based on the report and additional evidence introduced at an open court hearing. (*Id.* at pp. 526-527, 530.)

As noted *ante*, at page 1242, in *Tulare*, we outlined a water allocation method in a case in which the plaintiffs' water rights had different priorities. We also observed that "[t]he trial court . . . must fix the quantity required by each [right holder] for his actual reasonable beneficial uses, the same as it would do in the case of an appropriator." (*Tulare, supra,* 3 Cal.2d at p. 525.) This court determined that "[w]hat is a beneficial use at one time may, because of changed conditions, become a waste of water at a later time." (*Id.* at p. 567.) Because the court cannot fix or absolutely ascertain the quantity of water required for future use at any given time, a trial court should declare prospective uses paramount to the appropriator's rights, so the appropriator cannot gain prescriptive rights in the use. Until the paramount right holder needs it, the appropriator may continue to take water. (*Ibid.*)

Thus, water right priority has long been the central principle in California water law. The corollary of this rule is that an equitable physical solution must preserve water right priorities to the extent those priorities do not lead to unreasonable use. In the case of an overdraft, riparian and overlying use is paramount, and the rights of the appropriator must yield to the rights of the riparian or overlying owner. (*Burr v. Maclay Rancho Water Co.* (1908) 154 Cal. 428, 435 [98 P. 260]; *Katz v. Walkinshaw* (1903) 141 Cal. 116, 135 [74 P. 766].)

2. *Equitable Apportionment in Cases Involving Correlative Rights or Rights Established by Mutual Prescription*

Respondents rely on two cases to support their contention that article X, section 2 of the California Constitution requires the courts to apportion all water rights equitably, regardless of preexisting priorities: *City of Pasadena v. City of Alhambra* (1949) 33 Cal.2d 908 [207 P.2d 17] (*City of Pasadena*), and *City of Los Angeles v. City of San Fernando* (1975) 14 Cal.3d 199 [123 Cal.Rptr. 1, 537 P.2d 1250] (*City of San Fernando*). We conclude these cases support the Cardozo appellants' position.

In *City of Pasadena,* extractors had been taking nonsurplus groundwater for over 30 years, creating an overdraft condition in the basin on which Pasadena relied as a water source. (*City of Pasadena, supra,* 33 Cal.2d at pp.

921-922.) Even after the overdraft occurred, all parties continued to pump the groundwater, creating a greater overdraft and interfering with everyone's ability to pump in the future. (*Id.* at p. 922.)

The plaintiff city and its chief water producer sued to determine the groundwater rights in the area and to enjoin the alleged overdraft to prevent the water supply's depletion. (*City of Pasadena, supra,* 33 Cal.2d at p. 916.) The trial court referred the action to the Division of Water Resources of the Department of Public Works, which produced a report on area-wide water rights. (*Ibid.*) All parties except the defendant water company, a public utility, stipulated to a judgment that allocated water and restricted total production to achieve safe yield in the basin. Because the stipulation was not binding on the utility, the issue in this court was how to determine its rights in relation to the stipulating producers in the same manner as if there had been no agreement. (*Id.* at pp. 916, 924.)

Without mentioning equitable apportionment, Chief Justice Gibson's majority opinion affirmed the trial court's judgment, enforcing the stipulation's terms against all parties, including the utility. (*City of Pasadena, supra,* 33 Cal.2d at pp. 916, 933.) This court discussed the nature of prescriptive groundwater rights in which rights of adverse users do not completely overtake owners' rights. It concluded that the pumpers had established prescriptive rights in part of the water supply. The court observed "that such rights were acquired against both overlying owners and prior appropriators, [and] that the overlying owners and prior appropriators also obtained, or preserved, rights by reason of the water which they pumped . . . ." (*Id.* at p. 933.) Applying the mutual prescription doctrine, this court concluded that all claimants had equal priority and agreed the trial court had appropriately reduced each party's production to achieve safe yield. (*Ibid.*)

In reaching its conclusion, *City of Pasadena* observed: "Although the law at one time was otherwise, it is now clear that an overlying owner or any other person having a legal right to surface or ground water may take only such amount as he reasonably needs for beneficial purposes. [Citations.] Public interest requires that there be the greatest number of beneficial uses which the supply can yield, and water may be appropriated for beneficial uses subject to the rights of those who have a lawful priority. [Citation.] Any water not needed for the reasonable beneficial uses of those having prior rights is excess or surplus water. In California surplus water may rightfully be appropriated on privately owned land for nonoverlying uses, such as devotion to a public use or exportation beyond the basin or watershed. [Citations.]

"It is the policy of the state to foster the beneficial use of water and discourage waste, and when there is a surplus, whether of surface or ground

water, the holder of prior rights may not enjoin its appropriation. [Citations.] Proper overlying use, however, is paramount, and the right of an appropriator, being limited to the amount of the surplus, must yield to that of the overlying owner in the event of a shortage, unless the appropriator has gained prescriptive rights through the taking of nonsurplus waters." (*City of Pasadena, supra,* 33 Cal.2d at pp. 925-926.)

Several decades later, Los Angeles sued to establish a prior right to groundwater in the upper Los Angeles River area in *City of San Fernando, supra,* 14 Cal.3d at page 207. ▮▮▮ The plaintiff city relied on its historic pueblo water rights,[11] while the defendants argued that *City of Pasadena* supported their mutual prescriptive rights claim to a proportionate share of the groundwater supply. (*City of San Fernando, supra,* 14 Cal.3d at pp. 210-211, 214.) This court upheld the plaintiff's pueblo rights and overturned the trial court's award of prescriptive rights against the plaintiff. This court held that Civil Code section 1007 precluded the defendants from obtaining prescriptive water rights against the plaintiff. (*City of San Fernando, supra,* 14 Cal.3d at pp. 274-277.)

This court reasoned: "The pueblo right gives the city holding it a paramount claim to particular waters only to the extent that they are required for satisfying its municipal needs and those of its inhabitants. 'It thus insures a water supply for an expanding city [citation] with a minimum of waste by leaving the water accessible to others *until such time as the city needs it.*' [Citation.]" (*City of San Fernando, supra,* 14 Cal.3d at p. 252, italics added by *City of San Fernando.*)

▮ This court rejected the defendants' contention that the mutual prescription doctrine developed in *City of Pasadena* was a "beneficent instrument for conservation and equitable apportionment of water in ground basins which are subjected to extractions in excess of the replenishment supply." (*City of San Fernando, supra,* 14 Cal.3d at p. 265.) In so doing, this court stated: "[T]he allocation of water in accordance with prescriptive rights mechanically based on the amounts beneficially used by each party for a continuous five-year period after commencement of the prescriptive period and before the filing of the complaint, does not necessarily result in the most equitable apportionment of water according to need. A true equitable apportionment would take into account many more factors." (*Ibid.*) In a footnote accompanying this sentence, this court observed: "The principles by which

[11]Pueblo water rights, along with riparian (including overlying) and appropriative rights, were the original species of water rights recognized in early California law. (*Pleasant Valley, supra,* 61 Cal.App.4th at p. 751.) Pueblo water rights apply to the municipal successors of the Spanish and Mexican pueblos. They are not implicated in the present matter.

the United States Supreme Court equitably apportions water among states are illustrated in *Nebraska* v. *Wyoming* (1945) 325 U.S. 589, 618 [89 L.Ed. 1815, 1831-1832, 65 S.Ct. 1332].[12] After observing that apportionment between states whose laws base water rights on priority of appropriation should primarily accord with that principle, the court said: 'But if an allocation between appropriation States is to be just and equitable, strict adherence to the priority rule may not be possible. For example, the economy of a region may have been established on the basis of junior appropriations. So far as possible those established uses should be protected[,] though strict application of the priority rule might jeopardize them. Apportionment calls for the exercise of an informed judgment on a consideration of many factors. Priority of appropriation is the guiding principle. But physical and climatic conditions, the consumptive use of water in the several sections of the river, the character and rate of return flows, the extent of established uses, the availability of storage water, the practical effect of wasteful uses on downstream areas, the damage to upstream areas as compared to the benefits to downstream areas if a limitation is imposed on the former—these are all relevant factors. They are merely illustrative, not an exhaustive catalogue. They indicate the nature of the problem of apportionment and the delicate adjustment of interests which must be made.' " (*City of San Fernando, supra,* 14 Cal.3d at pp. 265-266, fn. 61.)

Respondents claim this footnote provides the basis for the trial court's use of equitable apportionment to allocate water in an overdraft basin without regard to the owners' water priorities. (See *Hi-Desert County Water Dist., supra,* 23 Cal.App.4th at p. 1734, fn. 11; *Wright v. Goleta Water Dist.* (1985) 174 Cal.App.3d 74, 93 [219 Cal.Rptr. 740] (*Wright*).) Respondents further assert that by ignoring equitable considerations, the Court of Appeal's opinion conflicts with *City of San Fernando,* and that it leads to an unjust result by which the Cardozo appellants are free to produce any amount of water on a priority basis, while all others pay to import water to protect the resource.

We find no conflict. *City of San Fernando* distinguished *City of Pasadena, supra,* 33 Cal.2d 908, where a "restriction to safe yield on a strict priority

---

[12]Although it allocated priorities between states, the Supreme Court did not adjudicate the relative rights of appropriators *qua* appropriators: "The standard of an equitable apportionment requires an adaptation of the formula to the necessities of the particular situation. We may assume that the rights of the appropriators *inter se* may not be adjudicated in their absence. But any allocation between Wyoming and Nebraska, if it is to be fair and just, must reflect the priorities of appropriators in the two states." (*Nebraska v. Wyoming, supra,* 325 U.S. 589, 627 [65 S.Ct. 1332, 1355].) As amici curiae Cities of Fairfield, Vacaville, and Vallejo observe, no California court has ever applied the doctrine of equitable apportionment to resolve an intrastate water conflict. The Supreme Court developed the doctrine to fill the void of authority governing relative priority *between* states to preserve interstate comity.

basis might have deprived parties who had been using substantial quantities of ground water for many years of all further access to such water." (*City of San Fernando, supra,* 14 Cal.3d at p. 266.) By contrast, *City of San Fernando* correctly found that the same condition was not present in the Los Angeles River basin, and "the effect of the trial court's judgment in the present case was to eliminate [the] plaintiff's priorities based not on the timing of its appropriations but on its importation of . . . water and on its pueblo right." (*Id.* at p. 267.) In other words, in *City of San Fernando,* applying the mutual prescription doctrine would still have led to completely eliminating appropriative rights stemming from recent uses in favor of earlier uses, because the defendants began pumping while there was still a surplus. (*Id.* at pp. 266-267.) In contrast, appropriative rights were protected through the doctrine's application in *City of Pasadena.*

As the *City of San Fernando* court itself observed, "[P]rinciples governing appropriative and prescriptive water rights will be relevant to the determination on remand of the conflicting interests of the parties in the water of the [overdrafted] Sylmar basin." (*City of San Fernando, supra,* 14 Cal.3d at p. 278.) This court then observed that because the defendants' rights were subordinate to the plaintiff's rights, the plaintiff was "entitled to have the private defendants' extractions enjoined insofar as they would constitute an overdraft on the basin supply." (*Id.* at p. 291.) This court also noted that on remand the private defendants could show "overlying rights to native ground water for reasonable beneficial uses on their overlying land, subject to any prescriptive rights of another party." (*Id.* at p. 293.) This court reiterated: "Overlying rights take priority over appropriative rights in that if the amounts of water devoted to overlying uses were to consume all the basin's native supply, the overlying rights would supersede any appropriative claims by any party to the basin's native ground water [citation] except insofar as the appropriative claims ripened into prescriptive rights [citation]. Such prescriptive rights would not necessarily impair the private defendants' rights to ground water for *new* overlying uses for which the need had not yet come into existence during the prescriptive period. [Citation.]" (*Id.* at p. 293, fn. 100.) Accordingly, overlying defendants "should be awarded the full amount of their overlying rights, less any amounts of such rights lost by prescription, from the part of the supply shown to constitute native ground water." (*Id.* at p. 294.)

 Thus, one could read footnote 61 in *City of San Fernando* to suggest that if prioritization of rights results in denying recent appropriative users the right to produce water, some type of equitable appropriation may be implemented in intrastate water matters. But the case is not precedent for wholly disregarding the priorities of existing water rights in favor of equitable

apportionment in this state, where water allocation has been based on an initial consideration of owners' legal water rights. Case law simply does not support applying an equitable apportionment to water use claims unless all claimants have correlative rights; for example, when parties establish mutual prescription. Otherwise, cases like *City of San Fernando* require that courts making water allocations adequately consider and reflect the priority of water rights in the basin. (*City of San Fernando, supra,* 14 Cal.3d at p. 293, fn. 100.) The Court of Appeal's reasoning is consistent with this principle. As the Court of Appeal aptly observed, we have never endorsed a pure equitable apportionment that completely disregards overlying owners' existing legal rights. Thus, to the extent footnote 61 in *City of San Fernando, supra,* 14 Cal.3d at pp. 265-266, could be understood to allow a court to completely disregard California landowners' water priorities, we disapprove it.

### 3. *Equitable Apportionment After City of San Fernando*

Respondents claim that after *City of San Fernando, supra,* 14 Cal.3d 199, and relying on the dicta stated in footnote 61 on pages 265-266 of that case, courts approved the use of equitable apportionment as the basis to allocate water among users in an overdraft basin. But the cases on which respondents rely do not support the contention.

For example, in *Hi-Desert County Water Dist.,* the Court of Appeal stated: "Left unresolved in [*City of*] *Pasadena,* however, was whether by continuing to pump, an overlying user *in an overdrafted basin* retained its original overlying rights or obtained new ones by prescription. [Citations.] In 1975, in its most comprehensive statement of water law, our Supreme Court in [*City of San Fernando, supra,* 14 Cal.3d 199] finally clarified the proposition that overlying owners '*retain their rights* [to nonsurplus water without judicial assistance] *by using them.*' [Citation.]" (*Hi-Desert County Water Dist., supra,* 23 Cal.App.4th at p. 1731.) As against potential appropriators, the court noted that the five-year period for establishing prescriptive rights to nonsurplus water may be interrupted by the overlying owners' pumping of their nonsurplus water. (*Ibid.*) The court also observed that *City of San Fernando* rejected a mechanical application of the mutual prescription doctrine after noting it often fails to lead to an equitable water apportionment according to need. (*Hi-Desert County Water Dist., supra,* 23 Cal.App.4th at p. 1734.) As *Hi-Desert County Water Dist.* observed, *City of San Fernando* required courts to consider many more factors than the amount the parties pumped during the prescriptive period in order to make a truly equitable apportionment. (*Hi-Desert County Water Dist., supra,* 23 Cal.App.4th at p. 1734, fn. 11.)

In *Wright,* overlying owners in a groundwater basin sued to determine relative water rights in that basin. The Court of Appeal found the trial court

erred in holding that a water district's appropriative rights had a higher priority than the overlying owners' unexercised rights. (*Wright, supra*, 174 Cal.App.3d at pp. 78, 82.) The court also held that the trial court could not define or otherwise limit an overlying owner's future unexercised groundwater rights, in contrast to this court's limitation of unexercised riparian rights. (*In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 358-359 [158 Cal.Rptr. 350, 599 P.2d 656] (*Long Valley*).[13] (The *Wright* court remanded the matter for reconsideration in light of *Tulare, supra*, 3 Cal.2d at p. 525, which held that former article XIV, section 3 [now article X, section 2] of the California Constitution protected the reasonable beneficial uses of the riparian or overlying owner, whose water could be used by an appropriator only when that owner elected not to use it.) ▉ Contrary to respondents' contention, no appellate court has endorsed an equitable apportionment solution that disregards overlying owners' existing rights.

## C. *The Physical Solution*

Respondents argue that article X, section 2 of the California Constitution mandates that we accept the trial court's proposed physical solution. The trial court found as follows: "Having found that all rights are correlative, a just and fair result is achieved by establishing a physical solution which limits each user to a proportionate equitable share of the total amount available." The court estopped all parties from asserting special priorities or preferences. It concluded it had "the authority to draft and impose a physical solution which requires all users to share equitably in the cost and reduction of use, to safe yield."

We agree that, within limits, a trial court may use its equitable powers to implement a physical solution. (See, e.g., *Peabody, supra*, 2 Cal.2d at pp. 383-384 [court has power to make reasonable regulations for water use,

---

[13]The *Wright* court refused to apply *Long Valley, supra*, 25 Cal.3d at page 350, to limit the scope of an overlying owner's future unexercised groundwater right to a present appropriative use, because the comprehensive legislative scheme applicable to the adjudication of surface water rights and riparian rights is not applicable to groundwater. (*Wright, supra*, 174 Cal.App.3d at pp. 87-89.) Although we do not address the question here, *Wright* does suggest that, in theory at least, a trial court could apply the *Long Valley* riparian right principles to reduce a landowner's future overlying water right use below a current but unreasonable or wasteful usage, as long as the trial court provided the owners with the same notice or due process protections afforded the riparian owners under the Water Code. (See Wat. Code, § 1200 et seq.; *Wright, supra*, 174 Cal.App.3d at pp. 87-89.) If Californians expect to harmonize water shortages with a fair allocation of future use, courts should have some discretion to limit the future groundwater use of an overlying owner who has exercised the water right and to reduce to a reasonable level the amount the overlying user takes from an overdrafted basin.

provided they protect the one enjoying paramount rights].) In *City of Lodi v. East Bay Mun. Utility Dist.* (1936) 7 Cal.2d 316, 341 [60 P.2d 439], this court recognized a trial court's power to enforce an equitable solution even if all parties do not agree to it, but cautioned against unreasonably burdening any party. The court observed that a physical solution is generally a practical remedy that does not affect vested rights. "Under such circumstances the 1928 constitutional amendment, as applied by this court in the cases cited, compels the trial court, before issuing a decree entailing such waste of water, to ascertain whether there exists a physical solution of the problem presented that will avoid the waste, and that will at the same time not unreasonably and adversely affect the prior appropriator's vested property right. In attempting to work out such a solution the policy which is now part of the fundamental law of the state must be adhered to." (*Id.* at pp. 339-340.) In other words, "a prior appropriator . . . cannot be compelled to incur any material expense in order to accommodate the subsequent appropriator." (*Id.* at p. 341.)

Other cases hold that a physical solution may not violate the constitutional principle that requires water to be put to beneficial use to the fullest extent possible. (*Hillside Water Co. v. Los Angeles* (1938) 10 Cal.2d 677, 685-686 [76 P.2d 681].) In *Rancho Santa Margarita v. Vail* (1938) 11 Cal.2d 501, 561 [81 P.2d 533] (*Vail*), this court held that a trial court may not demand that any one party spend large sums of money in order to satisfy a physical solution. (See *Allen v. California Water & Tel. Co.* (1946) 29 Cal.2d 466, 483-484 [176 P.2d 8] [rejecting proposed physical solution and finding overlying owners entitled to make reasonable use of water without incurring substantial costs].)

Thus, although it is clear that a trial court may impose a physical solution to achieve a practical allocation of water to competing interests, the solution's general purpose cannot simply ignore the priority rights of the parties asserting them. (See *City of San Fernando, supra,* 14 Cal.3d at p. 290.) In ordering a physical solution, therefore, a court may neither change priorities among the water rights holders nor eliminate vested rights in applying the solution without first considering them in relation to the reasonable use doctrine. (See 1 Rogers & Nichols, Water for California (1967) § 404, p. 549, and cases cited.)

Respondents unpersuasively argue for imposition of an equitable physical solution that disregards prior legal water rights. They cite the principle that the State Constitution requires the greatest number of beneficial users that the water supply can support, but they omit the requirement that this use be subject to the rights of those with lawful priority to the water. In addition, respondents rely on *Vail* to support their contention that a physical solution

should be based on the trial court's broad equitable powers. But *Vail* concerned a conflict between riparian right holders, not a situation where one party's rights were paramount to the other's. (*Vail, supra,* 11 Cal.2d at p. 508.)

Respondents also rely on *Imperial Irrigation Dist. v. State Wat. Resources Control Bd.* (1990) 225 Cal.App.3d 548, 572 [275 Cal.Rptr. 250]. But in that case the court had to decide whether an unconstitutional misuse of water occurred, and it did not adjudicate rights among competing water users, as here. Respondents simply fail to produce compelling authority for their argument that courts can avoid prioritizing water rights and instead allocate water based entirely on equitable principles.

### D. *Appellants' Water Rights*

In the trial court, respondents contended that neither the Cardozo appellants nor Jess Ranch sustained their burden of proving they possessed *any* water rights. The trial court agreed as to the Cardozo appellants. The court acknowledged that Jess Ranch testified as to its riparian, overlying, and appropriative rights, and, as the Court of Appeal observed, the evidence showed overlying rights, but the trial court found it unnecessary to determine the effect of those rights on its decision. The Court of Appeal concluded that Jess Ranch need not rely on those rights in order to participate in the physical solution and judgment.

### 1. *Cardozo Appellants*

After concluding that several Cardozo deeds had not reserved riparian rights on behalf of the Cardozo appellants, the Court of Appeal nevertheless disputed the trial court's finding that they had no overlying rights. Here, the Court of Appeal reasoned, "overlying rights are a property right appurtenant to the land, and are based on ownership. [Citations.] Although limited to the amount needed for beneficial use, irrigation for agriculture is clearly such a use, and respondents did not claim otherwise. [Citations.]"

After pointing out that overlying rights are dependent on land ownership over groundwater, and are exercised by extracting and using that water, the Court of Appeal concluded: "Having shown ownership, extraction and beneficial use of the underground water here, the Cardozo Appellants established overlying rights, and the contrary finding of the trial court is without evidentiary or legal support. [¶] . . . [¶] We repeat the guiding principle: 'Under California law, "[p]roper overlying use . . . is paramount, and the right of an appropriator, being limited to the amount of the surplus, must

yield to that of the overlying owner in the event of a shortage *unless the appropriator has gained prescriptive rights through the taking of nonsurplus waters.*" [Citation.]' (*Hi-Desert County Water Dist.* v. *Blue Skies Country Club, Inc., supra,* 23 Cal.App.4th 1723, 1730-1731, italics added, original italics omitted.) Thus, while the rights of all overlying owners in a ground-water basin are correlative and subject to cutbacks when the basin is overdrafted, overlying rights are superior to appropriative rights. Here, the trial court did not attempt to determine the priority of water rights, and merely allocated pumping rights based on prior production. This approach elevates the rights of appropriators and those producing without any claim of right to the same status as the rights of riparians and overlying owners. The trial court erred in doing so."

Although the Court of Appeal agreed with the Cardozo appellants in doubting the legal propriety of some aspects of the physical solution, the court did not agree that it should reverse the entire judgment without regard to the rights of the stipulating parties. The Court of Appeal explained, "While we share the Cardozo Appellants' doubts as to the legal propriety of various aspects of the trial court's physical solution, such as allowing transfer of water produced in accordance with riparian or overlying rights to nonriparian or nonoverlying lands, we do not need to consider those aspects of the physical solution. We see no reason why the parties cannot stipulate to a judgment incorporating the physical solution, nor do we see any reason why a stipulated judgment entered into by a large number of water producers in the Mojave Basin should be totally reversed when the rights of the Cardozo Appellants can be fully protected by appropriate trial court orders on remand. [Citations.] . . . [¶] Thus, we protect the rights of the Cardozo Appellants while also respecting the rights of the stipulating parties to agree to a judgment which waives or alters their water rights in a manner which they believe to be in their best interest."

Accordingly, the Court of Appeal reversed the trial court judgment against the Cardozo appellants, concluding that the trial court could not ignore their preexisting legal water rights. The court did recognize, however, that the stipulating parties could agree to be bound by the physical solution regardless of any water rights they may have had. At the same time, the Court of Appeal concluded: "[A]ny person or entity that produced more than a minimal amount of water in the 1986-1990 period was allowed to stipulate to the judgment, regardless of whether they had any provable water rights. Essentially, they could waive their existing water rights and agree to be bound by the terms of the stipulated judgment, so long as the rights of the nonstipulating parties were respected. [Citation.]" The Court of Appeal directed the trial court to exclude the Cardozo appellants from the judgment

and to grant them injunctive relief protecting their overlying water rights to the current and prospective reasonable and beneficial need for water on their respective properties.

The Court of Appeal also reversed the trial court's May 6, 1996, award of costs to the respondents as the prevailing parties against the Cardozo appellants. The court reasoned that because the Cardozo appellants should have been excluded from the judgment, respondents were no longer prevailing parties. It also directed the trial court to order a refund of any assessments the Cardozo appellants paid under the judgment pending appeal.[14] In all other respects, the court affirmed the trial court judgment as to those appellants.

Respondents principally disagree with the Court of Appeal's conclusion that the trial court erred in ignoring the Cardozo appellants' legal water rights in its equitable physical solution and judgment. They initially contend that the Court of Appeal's resolution of the Cardozo appellants' appeal gives those parties the right to extract an unlimited amount of water from the basin. We disagree. When the water is insufficient, overlying owners are limited to their "proportionate fair share of the total amount available based upon [their] reasonable need[s]." (*Tehachapi-Cummings County Water Dist. v. Armstrong* (1975) 49 Cal.App.3d 992, 1001 [122 Cal.Rptr. 918].)

Respondents also argue that overlying pumpers in an overdrafted basin should be required to file an action to adjudicate groundwater rights at the first indication of substantial growth in the area. ▮ However, overlying pumpers are not under an affirmative duty to adjudicate their groundwater rights, because they retain them by pumping. (*City of San Fernando, supra,* 14 Cal.3d at p. 293, fn. 100; *Hi-Desert County Water Dist., supra,* 23 Cal.App.4th at pp. 1731-1732.)

▮ As overlying owners, the Cardozo appellants have the right to pump water from the ground underneath their respective lands for use on their lands. The overlying right is correlative and is therefore defined in relation to other overlying water right holders in the basin. In the event of water supply shortage, overlying users have priority over appropriative users. (*City of Pasadena, supra,* 33 Cal.2d at p. 926.) The Court of Appeal properly recognized that the Cardozo appellants retained their overlying rights by

---

[14]The Court of Appeal did not find the trial court abused its discretion in requiring the Cardozo appellants to post an undertaking to guarantee the payment of the water assessments for which the judgment provided. It simply found that because the Cardozo appellants were not subject to the judgment, the trial court should order a refund of any assessments they had paid to date. We leave the resolution of any remaining issues involving the assessment question for the court on remand.

pumping, and that no claim of prescription had been asserted to reduce those retained overlying rights.

 Likewise, no precedent exists for requiring an overlying user to file an action to protect its right to pump groundwater. The laches doctrine did not bar a plaintiff's action, for example, even where defendant cities increased their pumping of an overdrafted water supply long before the action commenced, and development relied on the new water production in the interval. (*Orange County Water District v. City of Riverside* (1959) 173 Cal.App.2d 137, 219-220 [343 P.2d 450].)

### 2. Jess Ranch

 Although the Court of Appeal was careful not to endorse the physical solution or trial court judgment, it considered whether Jess Ranch had the right to be included in the physical solution on the same terms as some other stipulating parties. The trial court judgment specified free production allowances for the basin's water producers. For most, this value was set at the producer's maximum production during the years 1986-1990. Jess Ranch's free production allowance was calculated differently, and it appealed, contending that it should be allowed to participate in the stipulated judgment on the same terms offered to other producers. Thus, the Jess Ranch appeal presents different issues than does that of the Cardozo appellants. Jess Ranch wishes to participate in the physical solution, but contends it has been prevented from doing so on the same terms offered the other water producers in the Mojave Basin.[15] The Court of Appeal agreed with Jess Ranch, and respondents seek reversal of that judgment.

Specifically, the trial court examined Jess Ranch's water use and concluded it failed to establish that the use was reasonable and beneficial. During the period for which water production was reviewed, Jess Ranch had

---

[15]Prior to oral argument, we granted Jess Ranch's motion to take judicial notice of the Fourth Annual Report of the Mojave Basin Area Watermaster, Water Year 1996-1997 (Apr. 1, 1998), the most recent annual report the Mojave Water Agency was required to file with the trial court in its capacity as a watermaster. (See *City of Sacramento v. State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 967, fn. 2 [3 Cal.Rptr.2d 643].)

As to other pending matters, we rule as follows: (1) deny Jess Ranch's motion for immediate issuance of the remittitur to the superior court, for failure to show good cause under California Rules of Court, rule 25(b); and (2) deny amicus curiae Pacific Legal Foundation's motion to strike footnote 21 of respondents' consolidated answer to amici curiae briefs, page 24, for containing an inaccurate characterization of Pacific's amicus curiae brief, and instead disregard the defect and consider the brief without it. (Cal. Rules of Court, rule 18(3).)

been involved in aquaculture (trout production). Aquaculture requires recirculating water through fishponds, and there is little consumptive use or surface evaporation. Leftover water flows out the other end of the ponds and is applied to irrigation. From a gross annual production of 18,625 acre-feet, the trial court estimated Jess Ranch's total consumptive use at 7,480 acre-feet. The court used this value to set Jess Ranch's free production allowance. The judgment allowed Jess Ranch to continue to produce recirculated water for aquaculture, but required it to discharge the water directly to the Mojave River after this use.

In our view, the trial court's estimate of Jess Ranch's free production allowance was based on reasonable assumptions. Although Jess Ranch practiced agriculture and aquaculture during the period used for calculating free production allowances, it is in the process of changing its property use to commercial and residential. The trial court estimated its future consumptive use at 1,300 acre-feet per year. It concluded that evidence did not establish the amount of land Jess Ranch had in agriculture. On the basis of expert testimony, the court multiplied an upward estimate, 600 acres, by 10 acre-feet per acre, with the product representing the agricultural water use. This product was added to the estimated amount of water lost from lake evaporation and the amounts needed for home use and greenbelt irrigation. The sum is Jess Ranch's consumptive use. The court used this value as its free production allowance.

Jess Ranch was not the only party whose free production allowance was set equal to its estimated consumptive use. Twenty-five other parties, including the California Department of Fish and Game, maintained fish hatcheries or recreational lakes; their free production allowances were also set at the level of their consumptive use (total production less recirculated water).[16] Some other recreational lakes were given base production rights based on

---

[16]Jess Ranch has highlighted a number of parties that reused water without having their free production allowances adjusted. For example, the Silver Lakes Association reused water on a golf course. These producers are distinguishable from the subgroup of hatcheries and recreational lakes discussed above. With the possible exception of the Hesperia Water District, the trial court assumed that the latter group recirculated unused water to the basin. The Hesperia Water District (Hesperia) maintained an aquaculture operation using 700 acre-feet per year, about 6 percent of its production allowance. It is not clear from the judgment or amended statement of decision why the trial court did not reduce Hesperia's production allowance to reflect this usage. Certainly aquaculture represents a far smaller percent of Hesperia's total water use (less than 6 percent) than is the case with Jess Ranch (over 60 percent). This possible exception does not disturb the conclusion that Jess Ranch was treated like the majority of other hatcheries and recreational lakes that recirculated water. This subgroup all returned well over 50 percent of the water they produced to the basin.

actual production, with the contingency that if they ever ceased production, they could only transfer their consumptive use portion of those rights.[17]

The trial court exercised its equitable powers in approving the proposed physical solution and entering the judgment, and the Court of Appeal properly reviewed the judgment under the abuse of discretion standard of review. (*In re Marriage of Doud* (1986) 181 Cal.App.3d 510, 524-525 [226 Cal.Rptr. 423].) But where the Court of Appeal found an abuse of discretion as to Jess Ranch, we do not. Equity demands that similarly situated parties be treated similarly. Jess Ranch was one of 26 producers that recirculated water. It seems reasonable to differentiate these users from others that did not recirculate water, but that put their full gross production amount to use. It is difficult to fathom what reasonable, beneficial purpose is served by allowing Jess Ranch to retain both the amount of water used and the amount recirculated.

## V. DISPOSITION

We affirm the Court of Appeal judgment in all respects except that we reverse its judgment as to the Jess Ranch appeal. We therefore remand the matter to the Court of Appeal for further proceedings consistent with this conclusion.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Brown, J., and Johnson, J.,* concurred.

The petition of appellant Jess Ranch Water Company for a rehearing was denied October 25, 2000. Werdegar, J., did not participate therein.

---

[17]Jess Ranch also argues that if we reverse the Court of Appeal judgment in its favor, we must on remand require the trial court to consider its water priorities in determining its prior allocation under the physical solution and trial court judgment. But like the Court of Appeal, we find it unnecessary for the trial court to establish Jess Ranch's water rights on remand as long as Jess Ranch seeks to participate in the physical solution. As the Court of Appeal observed, the physical solution "establishes a system of water regulation for the stipulating parties that is independent of their water rights, if any, under traditional application of riparian, overlying or appropriative priorities. Since Jess Ranch seeks to participate in the system established by the [physical solution], it must waive its existing water rights in order to do so. Thus, the question of whether it has existing rights is irrelevant for this purpose. If Jess Ranch desires to participate in the [physical solution], it must, for this purpose, refrain from asserting its existing water rights and it must accept all of the terms of the [physical solution] judgment that are applicable to all stipulating parties."

*Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6, of the California Constitution.